# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

AEROSONIC CORPORATION,

     Plaintiff,

v.                                    CASE NO: 8:09-cv-1355-T-26EAJ

LIBERTY MUTUAL FIRE INSURANCE
COMPANY and ARTHUR J. GALLAGHER
RISK MANAGEMENT SERVICES, INC.,

     Defendants.
_____/

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

     Counter-Plaintiff,

v.

AEROSONIC CORPORATION,

     Counter-Defendant.


_____/


## O R D E R

Before the Court are pre-discovery cross-motions for summary judgment on the

issue of insurance coverage limits: (1) Plaintiff's Motion for Summary Judgment as to

Count I (Dkt. 19), Defendant's Response (Dkt. 25) and (2) Defendant/Counter-Plaintiff's

Motion for Summary Judgment (as to counts I and II) (Dkt. 18), and Plaintiff's Response in Opposition (Dkt. 24). Despite the varying copies of schedules referred to in the policy, the parties have filed a stipulated version of the "Statement of Values" schedule for this Court to consider as true for purposes of this summary judgment proceeding. (Dkt. 23). After careful consideration of the submissions of the parties and the file, the Court concludes that summary judgment should be granted on count I in favor of Liberty Mutual.

## PERTINENT FACTS

Plaintiff Aerosonic Corporation (Aerosonic) and Defendant Liberty Mutual Fire Insurance Company (Liberty Mutual) agree to the following facts for purposes of determining coverage under a property and casualty policy on summary judgment.[1] Aerosonic manufactures aircraft instrumentation, sensors, and displays from three facilities, two of which are located in different cities in Virginia and one in Clearwater, Florida. A catastrophic fire occurred on August 8, 2008, at the Clearwater, Florida, facility located at 1212 N. Hercules Avenue. The Clearwater facility consists of two locations or buildings, one where "intermediate and/or final steps" in the manufacture take place, from which the products are then either shipped to customers or delivered to

---

[1] Defendant Arthur J. Gallagher Risk Management Services, Inc. (Gallagher), as the insurance broker for Aerosonic, is not involved in these summary judgment proceedings. The latter three counts of the complaint, counts III, IV, and V, are directed against Gallagher and seek damages for its actions as an insurance broker in its dealings with Liberty Mutual. (Dkt. 1).

another "main production" building where the "final manufacturing and assembly" takes place. (Dkt. 1, para. 12). The fire burned down the building in which intermediate production takes place and that burned building will be referred to as the "Rear Bldg Testing"[2] building.

In response to an insurance claim filed by Aerosonic, Liberty Mutual paid Aerosonic $3,150,000.00; however, Aerosonic demands what it contends is within the full policy limits in the total amount of $8,075,000.00. Aerosonic submits the following as qualifying losses: (1) real property in the amount of $1,887,000.00; (2) personal property in the amount of $4,151,000.00; (3) business income in the amount of $1,987,000.00; and (4) extra expense in the amount $50,000.00. Liberty Mutual paid the following amounts on the claim: (1) real property in the amount of $1,400,000.00; (2) personal property in the amount of $1,200,000.00; (3) business income in the amount of $500,000.00; and (4) extra expense in the amount of $50,000.00.[3] The issue is one of contract interpretation as to the specific limits of liability under the policy.

## THE POLICY

---

[2] The burned building is described as the "Rear Bldg Testing" in the Statement of Values referred to in insurance policy number Yu2-L9L-441146-018. See docket 23.

[3] Liberty Mutual reserves the right to contest the amount of damages listed in paragraph 14 of the Complaint, which is set forth in the amount of $8,075,000.00.

Through its broker Gallagher,[4] Aerosonic obtained a policy of property and casualty insurance, number Yu2-L9L-441146-018 (the policy), from Liberty Mutual for the effective period of April 1, 2008 to April 1, 2009.[5] There is no question that the policy[6] provides coverage for the fire. The only question is what are the policy limits for the fire. The policy consists of the following major sections: (1) declarations; (2) coverages; (3) extensions of coverage; (4) exclusions; (5) property not covered; (6) valuations; (7) conditions; (8) definitions; (9) at least twenty-six endorsements; (10) several notices of assessments, surcharges and disclosures; and (11) two change endorsements. (Dkt. 18, Ex. A). The "insuring agreement" and "coverages" are set forth in the Declarations section as follows:

> 1. Insuring Agreement
>
> Subject to all the terms and conditions of this **policy**, **we** will pay for direct physical loss or damage to **covered property** as a result of an **occurrence**, unless excluded.
> . . . .

---

[4] For purposes of this summary judgment proceeding, the Court will assume that the policy at docket 18, Exhibit A, and the Statement of Values found at docket 23 are the authentic documents procured by Gallagher.

[5] Liberty Mutual notes that not only must this Court consider the Statement of Values as authentic but it must also assume that it was incorporated by reference into the policy; otherwise, a disputed issue of material fact would prevent summary judgment. This particular issue—the incorporation by reference of the Statement of Values— will be addressed later in this order.

[6] The policy is characterized as a blanket policy by Aerosonic and as a scheduled policy by Liberty Mutual. This point of contention is at the heart of the coverage limitation issue, according to the parties.

2.  Coverages

**We** provide the following coverages if they are marked with
an "X".  Coverages are provided in accordance with the terms
of this policy . . .

(X) **Real Property**
   (X) **Replacement Cost**
(X) **Personal Property**, including **valuable papers and
records**
   (X) **Replacement Cost**
 . . . .
(X) Loss of **Business Income**
   (X) **Real Property** or **Personal Property** and
   **Equipment Breakdown**
 . . . .

(Dkt. 18, Ex. A, Declarations at para. 2, RM1000 12-07)[7] (emphasis in original).  The

"limits of liability" in the Declarations section provides as follows:

3. **Limits of Liability**

**We** will not pay more than the applicable **limit of liability**
shown on the Schedule of the **DECLARATIONS** for any one
(1) **occurrence** . . .

(Dkt. 18, Ex. A, Declarations at para. 3, RM1000 12-07) (emphasis in original).  The

"Schedule of the DECLARATIONS" referred to in the "limits of liability" section above

can be found at the end of the Declarations section as follows:

Schedule

| No. | Location | Coverage | **Limit of Liability** |
|-----|----------|----------|------------------------|

---

[7]   The two capital letters followed by a number denotes the form number on the
bottom left of the particular page of the policy.

Coverage including  coverage                              See Statement of Values*
for Equipment Breakdown
and limits by location as per
Statement of Values on file
with us.  Insurance does not
apply at locations and/or
coverages at locations unless
a specific value is provided
by you.

1.1-1.2,3-4                              Blanket Extra Expense              $50,000*

*Limits include Equipment Breakdown
In no event shall the total **Limits of Liability** arising out of one Equipment Breakdown
**accident** exceed $100,000,000

(Dkt. 18, Ex. A, Declarations at p. 5, RM1000 12-07) (emphasis in original).  The

"Statement of Values" referenced under the column of "Limit of Liability" is not

appended to the policy.  The parties, however, agree that a "Statement of Values" exists.

(Dkt. 23).  The "Statement of Values" does not use the term "liability limits;" however, it

sets forth "estimated values" in pertinent part[8] as follows:

**L.M. PROPERTY — STATEMENT OF VALUES**
. . . .
**LIST EACH AND EVERY BUILDING ADDRESS TO BE INSURED WITH VALUES AND COPE DATA
APPLICABLE TO EACH LOCATION.
ALL VALUES SUBMITTED MUST BE 100%.**

| Loc.# | Sub-loc.# | Location Name | City & State | Building | Machinery & Equip-ment | Accnts Rcv | Loss of Business Income | Extra Ex-penses | Total TIV |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |

---

[8]   The Statement of Values shown in the order deletes some of the columns and
other writing which appear in the record.  The Court has chosen the more salient columns
to reproduce based on the issues in this summary judgment proceeding and the difficulty
of reading any smaller print than necessary.

| 1 | 1 | Main Product-ion | Clear-water FL | 3,500,000 | 5,800,000 | 50,000 | 2,500,000 | 50,000 | 11,900,000 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | Rear Bldg Testing | Clear-water FL | 1,400,000 | 1,200,000 | | 500,000 | | 3,100,000 |
| 3 | 1 | | Earlys-ville VA | 4,500,000 | 6,500,000 | | 3,500,000 | | 14,500,000 |
| 4 | 1 | | Char-lottes-ville VA | 20,000 | | | | | 20,000 |

| Location Totals | 9,420,000 | 13,500,000 | 50,000 | 6,500,000 | 50,000 | 29,520,000 |
|---|---|---|---|---|---|---|

Signature of Insured or Authorized Employee _____ Date_____
We certify that this is a complete and true statement of our values as of the reporting date
and that the values provided are reported on the same basis as each type of property would
be valued according to the policy valuation provisions in the event of a loss.

The reported Loss of Business Income, Extra Expenses and Loss of Rents values are 100% of
the estimated values for the 12 months following the date of this report.

(Dkt. 23). This chart lists four locations, with the Clearwater location hosting two sub-

locations—the Main Production building and the Rear Bldg Testing building.

Other relevant provisions of the policy are found in the "coverages" section,

including the following:

> A. If coverage for **Real** or **Personal Property** is provided as
> shown in number 2. Coverages of the DECLARATIONS, **we**
> will pay for:
>
> **Covered loss** to **your real property, personal property** or
> **personal property of others** at or within one-thousand
> (1,000) feet of a location shown on the Schedule of the
> DECLARATIONS.

(Dkt. 18, Ex. A, Coverages at para. A, RM1001 09-04) (emphasis in original).  The

"coverages" section continues with respect to loss of business income as follows:

> B. If coverage for loss of **Business Income** is provided as
> shown in 2. Coverage of the DECLARATIONS, **we** will pay
> for:
>
> 1.   The actual loss of **business income**, **you** incur during a
> **period of restoration** directly resulting from a **covered loss**.
>
> 2.   The necessary expenses **you** incur, in excess of **your**
> normal operating expenses that reduces **your** loss of **business
> income**.  **We** will not pay more than **we** would pay if **you** had
> been unable to make up lost production or continue operations
> or services.
> . . . .
>
> 9.   The most **we** will pay for a loss under this coverage is the
> lesser of:
>
> (a)   **Your** actual loss of **business income** and necessary
> expense; or
>
> (b)   The applicable **limit of liability** shown on the Schedule
> of the DECLARATIONS.

(Dkt. 18, Ex. A, Coverages at para. B, RM1001 09-04) (emphasis in original).  Important

definitions found in the policy include the following:

> B.   **Actual cash value** means replacement cost less
> deductions for depreciation.
>
> D.   **Business income** means:
>
> Gross Earnings, plus all other earnings derived from the
> operation of the business, less all charges and expenses which
> do not necessarily continue during the **period of restoration**.

E.   **Covered location** means those locations shown on the Schedule of the DECLARATIONS, or on the Schedule of any endorsement to this policy.

F.   **Covered loss** means a loss to **covered property** at a covered location resulting from a **peril insured against**.

G.   **Covered property** means property insured by this policy.

R**.   Limit(s) of liability** means the maximum amount **we** will pay for a **covered loss**.

X.   **Occurrence** means all loss or damage attributable directly or indirectly to one (1) cause or series of similar causes.  All such loss or damage will be added together, and the total loss or damage will be treated as one (1) occurrence irrespective of the amount of time or area over which such loss or damage occurs.

AA.   **Personal property** means **your** tangible things, other than **real property**, including improvements and betterments you have made in buildings **you** do not own.

GG.   **Real property** means buildings and any other structure, including:

1.   Attached additions, extension, permanent fittings or fixtures;
2.   Machinery and equipment used to service the buildings;
3.   Yard fixtures.

HH.   **Replacement cost** means the cost to replace **covered property**: . . .

LL.   **Specified peril(s)** means direct physical loss or damage caused by or resulting from:

1.   Fire.

(Dkt. 18, Ex. A., Definitions at B, D, E, F, G, R, X, AA, GG, HH & II, RM1007 09-04) (emphasis in original).

Of the several endorsements of the policy, the following one specifically applies to the Clearwater facility:

> **VALUATIONS— ACTUAL CASH VALUE AMENDATORY**
>
> This endorsement modifies insurance provided under the following:
>
> VALUATIONS, Form RM1005
>
> **We** will pay for loss to **covered property** shown in the following Schedule at **actual cash value**.
>
> Schedule
>
> 1212 N. Hercules Rd.
> Clearwater, FL 33765

(Dkt. 18, Ex. A, Endorsements, RM1114 01-04) (emphasis in original).

## RESPECTIVE POSITIONS

Aerosonic takes the position that the Clearwater location is considered one location per the wording in the Statement of Values set forth above, but more importantly, per the wording of the policy itself. Consequently, Aerosonic contends that the fire loss should be covered as if it had damaged the entire Clearwater facility to the full extent of the values given in the Statement of Values for each of the "sub-locations." Thus, even though only one of the sub-locations was damaged, the Rear Bldg Testing building, Aerosonic claims that the limits for the loss include the total for both sub-locations, which

according to the chart is $15,000,000.00, which would cover the actual cost of the loss,

$8,075,000.00.[9]  The specific language in the policy that Aerosonic challenges is the

absence of an "applicable limit of liability" in the Schedule of the Declarations, as is

referred to in two other, separate provisions of the policy, both the "declarations" section

and the "coverages" section.  (Dkt. 18, Ex. A, Declarations at para. 3, RM1000 12-07;

Coverages at para. B.9, RM1001 09-04).

Aerosonic's alternative position rests on the policy provision concerning losses

occurring at or within 1000 feet of a "location."  Aerosonic reasons that if "location"

refers to the Main Production building only, then the Rear Bldg Testing building is within

1000 feet and should be covered in accordance with the amount listed for the Main

Production building on the Statement of Values set forth above.

Liberty Mutual contends that it paid the full limits of liability, as submitted by

Aerosonic on the Statement of Values, for the Rear Bldg Testing building per the

Statement of Values— the full amount of the values listed in the row designated Rear

Bldg Testing.  (Dkt. 23).  Liberty asserts that the full limits of liability for coverage of the

Rear Bldg Testing building is limited to the actual cash value per the endorsement set

forth above.  Liberty Mutual distinguishes in the Statement of Values between (1) the

columns in the chart labeled "Building," "Machinery & Equipment," "Loss of Business

---

[9]  Recall that the $8,075,000.00, which is contested by Liberty Mutual, consists of real property in the amount of $1,887,000.00, (2) personal property in the amount of $4,151,000.00, (3) business income in the amount of $1,987,000.00, and (4) extra expense in the amount $50,000.00.

Income," and "Extra Expense," and (2) the last sentence underneath the chart which refers to "estimated values" of "Business Income," "Extra Expense," and "Loss of Rents." That the Statement of Values describes only three items as "estimated values" in the last sentence of the chart is irrelevant because all of the values in the Statement of Values are "estimated values" and the policy incorporates those values as the "limits by location." Because one of the locations in the Statement of Values is designated as the Rear Bldg Testing building, Liberty Mutual argues that the limits for that particular location, the Rear Bldg Testing building, is limited to $3,100,000.00, as shown in the last column under "Total TIV."[10]

## ANALYSIS

A. *Applicable Law*

Jurisdiction in this case derives from diversity of citizenship. 28 U.S.C. § 1332. The substantive law of the state of Florida applies because the forum state is Florida. Sphinx Int'l, Inc. V. National Union Fire Ins. Co. of Pittsburgh, PA, 412 F.3d 1224, 1227 (11th Cir. 2005) (quoting Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1232 (11th Cir. 2004)). Insurance contracts, in particular, are governed by substantive state law. Id. (citing Provau v. State Farm Mut. Auto. Ins. Co., 772 F.2d 817, 819 (11th Cir. 1985)).

B. *Applicable Standard*

---

[10] Liberty Mutual seeks summary judgment on count II for breach of contract in addition to count I. This Court refrains granting summary on count II because the record indicates there may be genuine issues of fact as to the amounts owed after entry of this order.

The parties agree that under Florida law, "insurance contracts must be construed in accordance with the plain language of the policy." Sphinx, 412 F.3d 1224, 1227 (11th Cir. 2005) (quoting Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 165 (Fla. 2003)). Generally, under Florida law, ambiguities should be construed against the insurer. See Penzer v. Transp. Ins. Co., 545 F.3d 1303, 1306 (11th Cir. 2008) (citing State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998)). This Court's conclusion regarding any ambiguity of the insurance policy is, under Florida law, a question of law to be decided by the court. See Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co., 757 F.2d 1172 (11th Cir. 1985) (citing Smith v. State Farm Mut. Auto. Ins. Co., 231 So.2d 193, 194 (Fla. 1970)). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." Swire Pac. Holdings, 845 So.2d at 165 (quoting Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000)).

The parties disagree, however, on the appropriate standard to apply to the interpretation of this insurance policy should this Court determine that the policy is ambiguous. Aerosonic contends that insurance contract provisions, if found to be ambiguous, must be construed "in favor of the insured and strictly against the drafter." Sphinx, 412 F.3d at 1228. Liberty Mutual counters that the rule of *contra proferentum*— that a contract is construed against the drafter— does not apply in this case because (1) the policy is unambiguous, (2) both parties are commercial entities with equal bargaining

-13-

power,[11] and (3) even if the policy is ambiguous and the rule of *contra proferentum*

applies, Gallagher submitted the Statement of Values to Liberty Mutual and therefore any

ambiguities in the Statement of Values must be construed against Aerosonic.

## C.    *Ambiguity*

In determining whether the contract is ambiguous, the Court must read the contract

giving deference to its plain meaning.  Against the backdrop of finding the plain meaning

of the contract, several cases cited by the parties address the issue of ambiguity:

Northside Marina Ventures, LLC v. Lexington Ins. Co., 2007 WL 2316502 (S.D. Fla.

2007); Penzer; Kopelwitz v. Home Ins. Co., 977 F.Supp. 1179, 1185 (S.D. Fla. 1997);

Berkshire Refrigerated Warehousing, LLC v. Commercial Underwriters Ins. Co., 2006

WL 862877 (N.D. Ill. 2006); and Bratton v. St. Paul Surplus Lines Ins. Co., 706 S.W.2d

189 (Ark.Ct.App. 1986).  These cases will be compared and contrasted to the instant case

as various points arise in the interpretation of the policy.

### 1.    *Incorporation by Reference*

Perhaps the most contested document in this proceeding is the Statement of

Values, which is not technically "attached" to the policy.  Thus, the first issue to be

decided is whether an ambiguity exists in the failure to incorporate by reference the

Statement of Values into the policy.  As noted in a footnote above, Liberty Mutual

---

[11]    See Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 n. 4 (5th Cir. 1976) (articulating that the rule of construction against the insurer is reserved for only the typical insurance setting where the insured has no bargaining power and the policy is therefore a "contract of adhesion").

contends that a finding of no incorporation by reference prohibits summary judgment because that necessarily creates a genuine issue of material, disputed fact. Aerosonic disagrees that summary judgment is prohibited but acknowledges that findings regarding the incorporation of the Statement of Values will certainly affect the outcome: (1) whether the Statement of Values establishes the policy limits and (2) whether the policy is blanket or scheduled, thereby permitting the splitting of the Clearwater location into two sub-locations.

Aerosonic cites two cases under Florida law for the general proposition that "[a] mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporated document makes no specific reference that it is 'subject to' the collateral document." Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co., 328 F.Supp.2d 1319, 1333 (S.D. Fla. 2004); see also Affinity Internet, Inc. v. Consolidated Credit Counseling Servs., Inc., 920 So.2d 1286, 1288 (Fla.Dist.Ct.App. 2006) (holding that main document's stating that it is "subject to" all of the terms in another document, which was a user agreement found at a website, is insufficient to incorporate an arbitration provision in the user agreement into the main document). These two cases, however, involve different agreements and are distinguishable from the instant case. In Excess Risk, the main agreement referred to another agreement's *authority* to replace group insurance policies, and was therefore required to incorporate the actual terms of the authorizing agreement. In Affinity, the use

of the phrase "subject to" did not adequately incorporate by reference an arbitration provision found in a website user agreement.

The one-page Statement of Values at issue does not constitute a separate agreement that contains provisions affecting the authority of the policy as in <u>Affinity</u> or <u>Excess Risk</u>.  Rather, the Statement of Values is plainly referred to in the Schedule of DECLARATIONS as being "on file" with Liberty Mutual, and although not referenced as being "attached" to the policy, this Court finds it sufficient for purposes of binding the parties to its contents.  Cf. <u>Berkshire</u>, 2006 WL 862877, at *2 (reaching decision relying on Statement of Values "on file" with the company as referenced in the Occurrence Limit of the policy); <u>Bratton</u> (considering values on "Schedule Attached" with respect to the description and location of property covered).

2. *Scheduled versus Blanket Policy*

A "blanket policy" and a "scheduled policy" are "terms of art" that are defined by expert opinion.  <u>Reliance Ins. Co. v. Orleans Parish School Bd.</u>, 322 F.2d 803 (5th Cir. 1963).[12]  There is no expert opinion before this Court regarding how to characterize the policy at issue.  Nevertheless, Liberty Mutual posits that the policy is a scheduled policy, one that insures each location for the specific amount listed on the Statement of Values for four different locations, two in Clearwater and two in Virginia.  Liberty Mutual

---

[12]   In <u>Bonner v. Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit decided prior to October 31, 1981.

supports this contention by stating that the payment of a single premium for coverage of all four locations, coupled with the Schedule of DECLARATIONS referring to the Statement of Values that lists a separate value for each sub-location of the Clearwater location, makes the policy scheduled. Specifically, the coverage for the Rear Bldg Testing building is limited by the amount set forth in its particular row in the Statement of Values, and the amounts for the Main Production building are not to be lumped together for a total larger coverage amount. Aerosonic contends that whether the policy is blanket or scheduled does not change the fact that the policy fails to apply limits to coverage as to the loss at issue.

Liberty Mutual relies on <u>Bratton</u> in which the court construed a policy similar to, but not exactly like, the one at issue here. In <u>Bratton</u>, a business property insurance policy stated on the declarations page "See Schedule Attached" in reference to the description and location of property covered. There, the policy provided insurance for buildings and their contents at four different locations. Each building was given a value on the "Schedule of Locations" and a single premium was paid. The court in <u>Bratton</u> rejected the argument that the policy was a blanket one and found no ambiguity in the policy, gathering the intent of the parties from harmonizing the different clauses when reading the policy as a whole. Coverage was limited to the value assigned to the particular building and its contents that burned in the fire. The court reasoned that because the anticipation of a simultaneous destruction of property at all four locations was unlikely, the values for each location constituted a limitation of coverage.

Liberty Mutual also relies on <u>Anderson Mattress Co. v. First State Ins. Co.</u>, 617 N.E.2d 932 (Ind.Dist.Ct.App. 1993). In <u>Anderson</u>, the insurance policy contained a Statement of Values that insured separately scheduled and valued property. The <u>Anderson</u> court found that the policy was neither ambiguous nor a blanket policy, and limited fire coverage to the amount listed beside the particular piece of property.

Aerosonic cites <u>Reliance</u> in which the former Fifth Circuit held that a particular fire policy covering public schools was a "blanket policy" and not a "scheduled policy" as those terms are defined. In <u>Reliance</u>, the experts agreed that the "Location of Schools– Statement of Values" is typically prepared by an insured and used in connection with a blanket policy, and is not a part of the policy or related to a scheduled policy, for purposes of submitting to a fire prevention and rating bureau in Louisiana to arrive at an average rate. <u>Reliance</u>, 322 F.2d at 806. The testimony in <u>Reliance</u> showed that average rates were used in blanket policies as opposed to scheduled policies in which, typically, an endorsement incorporates a schedule listing every piece of property with an insurance amount. Apparently, it is not uncommon to find a blanket policy with a separate, specific listing of individual pieces of property with values, the values of which are averaged to calculate the insurance premium. In a scheduled policy, according to <u>Reliance</u>, the insured is charged a premium based on the risk involved for each additional piece of property on the endorsements.

All of the cases cited by the parties construe insurance agreements that are not exactly like the one at issue. The differences are significant enough to prevent this Court

from wholly adopting one court's interpretation over another's. The unsworn facts of this case, outside the four corners of the insurance contract, indicate that a single premium was used to purchase the policy, and an endorsement changed the type of coverage for the Clearwater location. Although Liberty Mutual confidently states that the endorsement changes the type of coverage applicable for *only* the Rear Bldg Testing building to actual cash value from replacement value, there is nothing on the face of the endorsement that leads to this conclusion. The endorsement contains the address of the entire Clearwater location, "1212 N. Hercules Rd., Clearwater, FL 33765," which is typed in above the word "Locations(s)." In short, the endorsement does not support a finding that it applies *only* to the Rear Bldg Testing building. Thus, to the extent this insurance contract should be deemed "scheduled" or "blanket," this Court finds the policy ambiguous and genuine issues of disputed, material fact exist as to this issue. Neither expert testimony, nor testimony of the parties exists from which this Court can make an educated decision on this issue. Deciding this particular issue, however, may not be necessary before determining the proper construction of the policy.

      3.     *Covered Property—Limits of Liability— Locations*

A plain reading of the policy reveals that Liberty Mutual agreed to pay for damage to "covered property" resulting from an occurrence. (Dkt. 18, Ex. A, Declarations at para. 1, RM1000 12-07). The boxes for "replacement value" were marked with an "X," meaning that the coverage was to be based on the replacement value as opposed to the actual cash value of the *real property, personal property, and equipment breakdown*, with

the exception of the previously mentioned endorsement.  (Dkt. 18, Ex. A, Declarations at para. 2, RM1000 12-07).   As noted earlier, an endorsement amended the valuation of the covered property to "actual cash value" for "1212 N. Hercules Rd., Clearwater, FL 33765." (Dkt. 18, Ex. A, Endorsements, RM1114 01-04).  The Court, however, does not see anything on the endorsement limiting its application to the Rear Bldg Testing building.  Keeping this inconsistency between counsel's representation and the document in mind, the extent of liability under the policy will be addressed.

The Declarations section of the policy describes the "limits of liability" as what Liberty Mutual will pay for any one occurrence, which will be no more than the "applicable limit of liability shown on the Schedule of DECLARATIONS."  (Dkt. 18, Ex. A, Declarations at para. 3, RM1000 12-07).  The controversial Schedule of DECLARATIONS states "See Statement of Values*" under the column titled "Limit of Liability."[13]  In that same schedule under the column titled "Location," the policy refers to a "Statement of Values on file with us."  It further denotes that (1) insurance does not apply to "locations and/or coverages at locations" unless a specified value is provided by the insured to Liberty Mutual, and (2) coverage includes "limits by location" that are found in the Statement of Values.  (Dkt. 18, Ex. A, Declarations at p. 5, RM1000 12-07).

---

[13]    The asterisk at the bottom of the Schedule of DECLARATIONS clearly encompasses further limits for Equipment Breakdown arising out of one Equipment Breakdown accident, which is not at issue in this case.

The policy does not define "applicable limit of liability" but it does define "limit of liability" as the maximum amount Liberty Mutual will pay for a "covered loss." (Dkt. 18, Ex. A, Definitions at para. R, RM1007 09-04). The term "covered loss" is defined in the policy as a loss to "covered property at a covered location resulting from a peril insured against." (Dkt. 18, Ex. A, Definitions at para. F, RM1007 09-04). A "covered location" is defined as the locations "shown on the Schedule of the DECLARATIONS, or on the Schedule of any endorsement to this policy." (Dkt. 18, Ex. A, Definitions at para. E, RM1007 09-04). At this point in the analysis, the plain reading of the policy gives us two places to find the "locations"—1) on the Schedule of the DECLARATIONS and 2) on the Schedule of any endorsement. Thus far, the term "location" is defined sufficiently to avoid ambiguity.

Having determined that the only relevant endorsement provides the address of the entire Clearwater facility, the Schedule of DECLARATIONS clearly refers to the Statement of Values. The Statement of Values contains four separate lines of "locations" with differing values assigned to four different entries. Although there are four lines, the "location" column numbers only three locations, not four. The Clearwater facility is listed as one location with two sub-locations. A crucial issue in this case is whether the entire Clearwater facility is one "location" for coverage purposes or whether the Rear Bldg Testing building is a location separate and apart from the Main Production building. Liberty Mutual contends that the Clearwater facility is two separate locations per the two separate rows in the Statement of Values with two separately assigned values.

Although the column titled "location" assigns only three numbers to the four lines, with the two Clearwater buildings labeled as "location #1," the column titled "sub-location" gives each of the two Clearwater buildings a separate number for a sub-location. The word "sub-location" is not defined in the policy. The absence of a definition is nevertheless not fatal to gleaning the plain meaning of the policy. First, the instructions on the Statement of Values direct the insured to list "each and every building address to be insured with values and cope data applicable to each location." Next, the Statement of Values clearly delineates four separate buildings or locations with data applicable to each location, regardless of whether the term "sub-location" is used to essentially separate the buildings at the Clearwater facility to adequately insure the property. More importantly perhaps, the Schedule of DECLARATIONS does not discount this reading of the policy because it refers to "locations and/or coverages at locations" that will appear on the Statement of Values on file. When this phrase is read together with the Statement of Values that clearly delineates four separate buildings or locations with four separate values, it simply provides finer details and delineates the coverage at the Clearwater facility, which describes a "coverage at location."

4. *Estimated Values*

Aerosonic argues that the values set forth in the Statement of Values do not represent the limit of liability for each of the four buildings or locations based on the use of the term "estimated values" in the language found at the bottom left of the Statement. The language provides that the "reported Loss of Business Income, Extra Expense, and

-22-

Loss of Rents values are 100% of the estimated values for the 12 months following the date of this report." Liberty correctly points out that the "estimated values" specifically refers to only the three items listed, the Loss of Business Income, Extra Expense, and Loss of Rents. The Statement of Values contains columns labeled "Building," "Machinery & Equipment," "Accnts Rcv," "Loss of Business Income," and "Extra Expense," and under each column appears a specific assigned value for each of the four locations. While it is true that the policy does not affirmatively state that the insurance company's liability is capped by these values and that the last sentence on the Statement of Values refers to "estimated values," it is clear from a reading of the policy that the insurer's liability is limited by whatever values appear on the Statement of Values, be they estimated or actual.[14] Thus, the limit of liability for the loss is $3,100,000.00, the sum of the values in the row denominated Rear Bldg Testing, which is the amount Liberty Mutual paid to Aerosonic.

     5.    *1,000 Feet Rule*

---

[14] Having not found that the policy provisions regarding the limits of liability to be ambiguous, the Court need not affirmatively construe the policy against Liberty Mutual. In any event, presumably Aerosonic or its agent Gallagher filled out the values in the Statement of Values and if any such ambiguity had been found, it would have been construed against the drafter, further assuming that each party in this savvy business deal had equal bargaining power. On the record, the bargaining power of Aerosonic has not been established, other than the fact that they perhaps vested all authority in Gallagher to negotiate the policy, in which case Gallagher may be deemed a sophisticated party with bargaining power equal to Liberty Mutual's.

Apart from the paragraph 2's "coverages" in the declarations section of the policy, the large section of the policy regarding "coverages" provides that Liberty Mutual will pay for "covered loss" to real and personal properties at or within 1,000 feet of a location shown on the Schedule of DECLARATIONS. As set forth in detail above, the Schedule of DECLARATIONS refers to the "locations" shown on the Statement of Values on file. Aerosonic asserts that his 1,000 feet provision should be used to include the total values of both the Main Production building and the Rear Bldg Testing building in calculating the liability limits for the loss in this case. Aerosonic argues that because the Rear Bldg Testing building is located within 1,000 feet of the Main Production building, the limits for the loss would total $11,900,000.00 plus $3,100,000.00, or $15,000,000.00.

Attributing a meaning to the 1,000 feet provision in the context of a plain reading of the policy does not support the interpretation espoused by Aerosonic. Dividing the Clearwater facility into two locations per the Schedule of DECLARATIONS and the Statement of Values necessarily prohibits coverage for the Rear Bldg Testing building under the application of the 1,000 feet provision to the Main Production building. Not only was the Main Production building not damaged, but the Rear Bldg Testing building is already a covered location incapable of being included in the 1,000 feet outside of a location. Applying this provision to invoke the greater liability limits of the Main Production building for coverage of damage to the location of the Rear Bldg Testing building renders the 1,000 feet provision nonsensical. Furthermore, there is no evidence

in this record that a covered loss occurred "at or within" 1,000 feet of either location at the Clearwater facility and at the same time not within either actual location itself.

      6.    *Loss of Business Income*

      With respect to loss of business income, as opposed to real or personal property, under the large section of the policy concerning "coverages," paragraph 9 provides that at most, Liberty Mutual will pay the actual loss of business income or the "applicable limit of liability shown on the Schedule of DECLARATIONS." The "applicable limit of liability" phrase has been seen once before, as noted above, in the declarations section of the policy. Again, the Schedule of DECLARATIONS shows no specific amount for loss of business income but simply refers to the Statement of Values. The Statement of Values provides for a specific amount for loss of business income for each location—$2,500,000.00 for the Main Production building and $500,000.00 for the Rear Bldg Testing building, for a total amount of $3,000,000.00.

      To the extent Aerosonic now argues that the total combined amount of loss of business income, $3,000,000.00 should be attributable to the loss, although the fire was restricted to the Rear Bldg Testing building, the separate values for loss of business income set forth for each building belie this position. Although the policy provides that the loss of business income should be paid, as determined by gross earnings in addition to earnings derived from the "operation of the business," this term does not require the clumping of both of the loss of business income values for both the buildings at the Clearwater facility. Rather, the policy also provides that Liberty Mutual must pay either

the lesser of the actual loss of business income or the value set forth in the Statement of Values. (Dkt. 18, Ex. A, Coverages at para. 9, RM1001 09-04). The limits of liability with respect to the loss of business income for the Rear Bldg Testing building is therefore $500,000.00, which is the lesser of the value in the Statement of Values and the actual loss.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)     Defendant/Counter-Plaintiff's Motion for Summary Judgment (Dkt. 18) is **GRANTED** as to count I and denied as to count II**.**

(2)     Plaintiff's Motion for Summary Judgment as to Count I (Dkt. 19) is **DENIED**.

(3)     The case shall proceed with respect to counts II, III, IV, and V.

**DONE AND ORDERED** at Tampa, Florida, on December 17, 2009.


      s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record